[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORADUM OF DECISION RE: MOTION TO REOPEN JUDGMENT
The defendant, Scott Nash, filed a Motion to Reopen judgment of paternity dated May 9, 2001. The minor child in this matter, Da'Naia Dawkins, was born to the plaintiff mother on April 10, 1993. The court file contains an Affirmation of Paternity executed by the plaintiff, Tamara Dawkins, and an Acknowledgment of Paternity executed by the defendant on May 27, 1993. Attached thereto is the "Information About The Acknowledgment Of Paternity" form (including in part a waiver of rights to a blood test, trial, and attorney) signed by the defendant on May 27, 1993. This acknowledgment was filed at Waterbury Superior Court on June 2, 1993.
The defendant was 15 years old when the child was conceived and 16 years old when the child was born and acknowledged. Although the parties could not recall exact dates, they are in general agreement that shortly after the child was born they commenced living together continually for about one year, initially in the home of the Plaintiff's mother for a couple of months and thereafter in their own apartment for several months. The relationship between plaintiff and defendant was less constant during the next. three or four years of the child's life. CT Page 14255 However, the defendant had continually contact with the child during this period. It than appears that there was minimal (and sometimes contentious) contact between the plaintiff and the defendant since late 1998, though it is unclear from the testimony as to when their relationship completely terminated.
A support petition dated July 10, 1998, was filed in this matter. The defendant did not dispute paternity in response to same. The parties appeared on September 4, 1998, at which time a temporary child support order was entered against the defendant. A permanent current child support order (plus $5 per week on the accrued arrearage to the State of Connecticut) was entered on November 20, 1998.
Subsequently, the defendant filed an application for waiver of fees for genetic testing (without a motion to reopen judgment), which application was denied by the court (Leheny, J.) on March 23, 2001. The defendant testified that he then took the child for genetic testing on April 17, 2001, without the plaintiff mother's knowledge (and obviously without an order from the court). The results of the genetic testing exclude the defendant as the biological father of Da'Naia Dawkins. These results have not been contradicted or challenged by the plaintiff mother or by the State of Connecticut.
The defendant father testified that during the plaintiff's pregnancy he specifically asked the plaintiff if their sexual relationship had been exclusive. He testified that the plaintiff responded "yes", and that he had no reason to suspect otherwise. The defendant testified on direct examination that he first became suspicious regarding his parentage a few months after the support orders were entered (i.e. early-to-mid 1999). He testifies that during a heated argument over money, the plaintiff mother stated that he was not Da'Naia's father, and that he was "stupid" to be paying child support. However, on cross-examination, the defendant acknowledged that he started having arguments with the Plaintiff regarding paternity in 1994 or 1995.
The plaintiff mother testified that she had an extended period of exclusive sexual relations with the defendant before and after the conception of this child, except for a one-night affair (about 7 or 8 weeks prior to learning she was pregnant) with a man she identified as one Mr. Ellis. She states that she has had no contact with Mr. Ellis since 1992. She states that (upon inquiry subsequent to the genetic test results) she believes this third party currently resides in Manhattan, New York, but has made no effort to contact him.
The plaintiff testified that three friends of the defendant entered the apartment as the affair was taking place, though they did not actually CT Page 14256 walk into the bedroom occupied by the couple. The plaintiff stated that she informed the defendant of the affair the next day, and the defendant immediately reacted by breaking off the relationship with the plaintiff. However, the Plaintiff indicated that they reconciled two days later. The plaintiff stated that they never discussed this episode again.
The defendant has moved to reopen the judgment of paternity, and argues that he should not be precluded from doing so by the three-year deadline set forth in Connecticut General Statutes § 46b-172, as he claims he can prove fraud, duress or material mistake of fact. The defendant further argues that his motion to reopen should not be barred by "laches".
These type of cases are difficult to address, given the many emotional and financial competing interests of all the parties. However, no issue is more important than the issue of what is in the best interests of the child, emotionally and financially. Perhaps the most profound legal decision that can be made during the life of a child is the determination (or subsequent termination) of paternity.
These issues have been thoroughly addressed and revisited numerous times through written decision issued at various levels of Connecticut courts. The Family Magistrate Digest is replete with such decisions rendered during the past several years. Many of these decisions have provided very detailed guideposts to follow on the these issues. However, the most obvious conclusion one draws from a review of these prior cases is that each such decision must be made on a case-by-case basis.
 I — FINALITY OF JUDGMENT
The Acknowledgment of Paternity, Affirmation and the waiver of rights forms referred to above were filed at Waterbury Superior Court on June 2, 1993, thereby having the same force and effect as a paternity judgment pursuant to Connecticut General Statutes § 46b-172 (a)(1), which reads in part: ". . . a written acknowledgment of paternity executed and sworn to by the putative father of the child when accompanied by (A) an attested waiver of the right to a blood test, the right to a trial and the right to an attorney, and (B) a written affirmation of paternity executed and sworn to by the mother of the child and filed with the Superior Court, for the judicial district in which the mother of the child or the putative father resides shall have the same force and effect as a judgment of that court. It shall be considered a legal finding of paternity without requiring or permitting judicial ratification, and shall be binding and the person executing the same whether he is an adult or a minor, . . .". Thus minors are specifically included as a class bound by the provisions of this statute. CT Page 14257
Further, Connecticut General Statutes § 46b-172 (a)(2) states in part: ". . . the prior judgment as to paternity shall be res judicata as to that issue for all paternity acknowledgments filed with the court on or after March 1, 1981, but before July 1, 1997, and should not be reconsidered by the court unless the person seeking review of the acknowledgment petitions the superior court . . . within three years of such judgment."
Our courts favor finality in judicial decisions. Martinez v. Collins,
15 S.M.D. ___ (January 7, 2001, Lifshitz, F.S.M.) (Citations omitted). Further, should there be any doubt regarding legislative intent on the subject of finality of paternity judgments, this court notes that Connecticut General Statutes § 46b-172 was amended by Public Act 97-7, thereby reducing the acknowledgment review period from three years to 60 days. It is, however, the 3-year period that applies in this case.
Further, there has been no claim made by the respondent that he was not properly advised of his rights or that he did not understand the significance of waiving such rights at the time he executed the Acknowledgment of Paternity and the waiver of rights form attached thereto.
 II — FRAUD, DURESS OR MISTAKE
Connecticut General Statutes § 46b-172 provides the court with the jurisdictional authority to consider reopening this judgment only upon a showing of "fraud, duress or material mistake of fact which may include evidence that he is not the father, with the burden of proof upon the challenger".
A. Fraud "The moving party bears a heavy burden of proof. Fraud must be proven by `clear and satisfactory evidence', a standard more exact than a fair preponderance of the evidence." (Citations omitted.) Martinez v.Collins, 15 S.M.D. ___ (January 21, 2001, Lifshitz, F.S.M.).
The moving party must prove the following elements of fraud: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon the false representation to his detriment. (Citations omitted.) Hemingwayv. Jones, 15 S.M.D. ___, 3 (February 16, 2001, Burt, F.S.M.); Martinezv. Collins, supra, 10 (citations omitted).
Further, even if a party has presented sufficient evidence to prove fraud, the judgment shall be set aside only if the moving party is not CT Page 14258 barred by any of the following restrictions:
"(1) There must have been no laches or unreasonable delay by the injured party after the fraud was discovered. (2) There must have been diligence in the original action, that is, diligence in trying to discover and expose the fraud. (3) There must be clear proof of the perjury or fraud. (4) There must be substantial likelihood that the result of the new trial will be different." Varley v. Varley, 180 Conn. 1, 4, 428 A.2d 317
(1980); McNealy v. Dancy, 13 S.M.D. 120.
"This Court as the trier of fact, is obligated to determine the credibility of witnesses and the weight to be given their testimony."Gatter v. Gatter, 15 S.M.D. ___ (2001, Lifshitz, F.S.M.); Griffin v.Nationwide Moving and Storage Co., 187 Conn. 405, 422, 446 A.2d 799
(182); Riccio v. Abate, 176 Conn. 415, 418, 407 A.2d 105 (179); Raia v.Topehius, 165 Conn. 231, 235, 332 A.2d 93 (1973); Cook v. Vieluch,32 Conn. App. 537, 549, 629 A.2d 1175, cert. denied. 228 Conn. 911,635 A.2d 1229 (1993).
The court has the right to accept part and disregard part of the testimony of any witness. Gatter v. Gatter, supra; Barrila v. Blake,190 Conn. 631, 639, 461 A.2d 1375 (1983); Smith v. Smith, 183 Conn. 121,123, 438 A.2d 842 (1981); Rood v. Russo, 161 Conn. 1, 3, 283 A.2d 220
(1971); Lynk v. Lynk, 11 S.M.D. 233, 241 (1997). The plaintiff testified that she had told the defendant of her one-night affair the day after it occurred and that the defendant reacted angrily by leaving her for a couple of days. This court finds the plaintiff's testimony regarding this episode to be credible. Therefore, the defendant clearly had been reasonably alerted to the possibility that he might not be the biological father. The plaintiff also testified that the respondent expressed happiness when the plaintiff informed the respondent in September of 1992 that she was pregnant. This court finds that there was no clear and unequivocal evidence presented to indicate that the plaintiff knew her affirmation to be false or that the respondent was induced to sign the acknowledgment and waive his rights to the paternity testing.
B. Duress Further, the defendant offered minimal testimony regarding the possibility of "duress". He testified that on one occasion after the child was born the plaintiff threatened to leave the state of Connecticut with the child if he questioned paternity. The defendant offered no corroborating evidence. However, even if this statement was accepted at face value, the evidence offered was insufficient to prove that such a statement was made prior to the defendant executing the Acknowledgment of Paternity. Further, even if this statement was made as an attempt to induce the defendant to sign the acknowledgment, there is no evidence to demonstrate that the respondent was left with no reasonable alternative CT Page 14259 but to sign it. In fact, the defendant presented no testimony regarding events surrounding the actual execution of the acknowledgment and waiver forms.
C. Material Mistake of Fact Prior to Public Act 97-7, the test was worded as "mutual mistake". Thus the revised language appears to allow the consideration of a unilateral mistake or mutual mistake. Unfortunately, there does not appear to be any Connecticut cases which clearly define the revised "material mistake" language. "There is no bright light standard as to what constitutes a `mistake' sufficient to confer jurisdiction on a court to reopen a judgment . . .". McNealy v. Dancy, 13 S.M.D. 113, 122, 1999 CT Supp. 12793 (Lifshitz, F.S.M.). Further, this court could not find any enlightening legislative intent language as guidance. However, it appears that the court could invoke this "material mistake" exception only if the plaintiff and/or the defendant did not know of the mistake, and that the defendant was not misled by the plaintiff's mistake. This court is unable to make such a finding on the facts of this particular case.
 III — LACHES
As indicated above, the respondent has not met his burden of proof as to fraud, duress, or material mistake of fact. However, even if the respondent had met his burden of proof as to any of these elements, this court finds that "laches" is a bar to reopening the judgment in this matter given the evidence presented and the totality of the circumstances.
The defendant's doubts of paternity should have been raised immediately, given the timing of conception. Additionally, the defendant's sister, Laurie Nash, testified that in 1993 the defendant told her that his friends told the defendant that they had "caught" the Plaintiff during her liaison with Mr. Ellis. This court finds this testimony of Laurie Nash to be credible and most critical.
Thus this court finds that the defendant was aware of the possibility of his non-paternity in 1993, had ample opportunity to act upon any doubts by obtaining genetic testing, and now has waited far too long to reopen this judgment.
 IV — CHILD'S INTERESTS
A line of Connecticut cases in recent years has added the right of the child to know her true biological parentage as an additional issue to be weighed in these type of cases. See Johnson v. Domina, Superior Court, J.D. of Hartford, Docket No. FA88-0340848, 1998 Conn. Sup. 11005 CT Page 14260 (September 24, 1998); Lillibridge v. Lillibridge, Superior Court, J.D. of Hartford, Docket No. FA89-0356816 (October 21, 1998). It is clear through the testimony of the parties, the defendant's mother, and the defendant's sister, together with information provided by the child's attorney that a solid father-daughter bonding existed until approximately two years ago. The defendant testified that he had pulled away from this child emotionally during the last couple of years. However, it is the view of this court that the issue of bonding should be assessed from the child's
point of view. The testimony of the plaintiff, defendant's mother, defendant's sister and information provided by the child's attorney confirms that the child still considers the defendant to be her father. As emotionally difficult as the exclusion of paternity may be upon the defendant, the child, is left to deal with this matter without the benefit of adult coping skills. The child is old enough to have bonded with the respondent, but not old enough to understand what it means to be a "biological father". The child's attorney reports that sadly, this child asked her whether the defendant was "still my daddy?". It is impossible to know at this point the depth and duration of the emotional impact upon the child. Parenthetically, this court questions the wisdom of the plaintiff informing the child of the genetic test results without first perhaps soliciting guidance from a child psychologist or similar expert.
The defendant declined genetic testing at his peril, it clearly is not in a child's best interest to allow a defendant to revoke his paternity at any time during a child's life. Our courts have ruled that the best interests of a child are prejudiced if a respondent is allowed to shed the mantle of fatherhood and its intendant financial and emotional responsibilities. Gatling v. Gatling, 1990 Ct. Sup. 801 (Waterbury Superior Court, Harrigan, J.)
The respondent's mother testified that she has maintained an ongoing relationship with the child and considers the child to be her granddaughter. She was not asked, and offered no opinion as to whether her son should be allowed to overturn the paternity judgment. The respondent's sister testified on behalf of the State of Connecticut. She testified that she has maintained a strong bond with the child and adamantly indicated that her brother should not be allowed to abdicate his parental obligations.
Clearly, one of the primary purposes of Connecticut General Statute § 46b-172 is to maximize the use of genetic testing and thereby minimize the frequency of attempts to reopen paternity judgments, in turn minimizing the occurrences of emotional trauma upon the children of this state. There are some who advocate the notion that our legislature should mandate genetic testing in all births involving unwed mothers, given the CT Page 14261 simplicity, unobtrusiveness and low cost of such testing. This court is supportive of such legislation, not as an insult in any fashion to unwed mothers, but in an effort to avoid the potential emotional trauma inflicted upon a child as reflected in this case. The certainty of paternity would be in a child's best interests. Mandatory testing would eliminate the possibility of a named father waiving a genetic test for fear of offending and/or alienating the mother. This also would minimize the possibility of a respondent pulling away from a child in later years due to lingering doubts, which doubts build to resentment. Many a respondent appearing on a contempt motion has expressed to this court his doubts of paternity as an excuse for non-payment of support and/or lack of contact with the child.
V. CONCLUSION
Finally, this court obviously has no authority to force Mr. Dawkins to continue to interact with the child as a "father" in any sense of the word. This child, not surprisingly, clings to the notion that Mr. Dawkins is her "Daddy", despite his recent avoidance of her. Her definition of "father" has been defined by her relationship with Mr. Dawkins. One can only hope that Mr. Dawkins will not use the genetic test results and his apparent animosity towards the plaintiff as an excuse to permanently dismiss this child from his life at this late date. Fatherhood goes far beyond the biological aspect of the word. Mr. Dawkins' mother and sister seem to understand this. He initiated the child's emotional and financial reliance upon him on the day he waived his rights to genetic testing and executed the acknowledgment.
If the respondent were to resume his relationship with the child, it is very likely that she would value and cherish this relationship far more than any relationship she may possibly develop with the biological father (if a relationship with the biological father ever were to be developed). This child now faces a double tragedy: the permanent rejection by the defendant coupled with the possible rejection by her biological father (should an attempt ever be made to contact him). Hopefully he can find it within himself to again accept this child's unconditional love. It should last long after the child support payments terminate. The motion to reopen is denied.
JOHN E. COLELLA Family Support Magistrate